# United States District Court
# For the District of Columbia

| (Civil) | |
|---|---|
| **NORTH CAROLINA RIGHT TO LIFE, INC., et al.,** | |
| *Plaintiffs*, | **Plaintiffs' Response to Motion to Quash Nonparty Subpoena** |
| *v.* | Misc. No. _____ (RCL) |
| **LARRY LEAKE, et al.,** | |
| *Defendants.* | **Case No. No. 5:99-CV-798-BO(3)**(E.D.N.C.) |

Plaintiffs North Carolina Right to Life, Inc. ("NCRL"), its political committee North Carolina Right to Life Political Action Committee ("NCRL-PAC") and its independent expenditure committee North Carolina Right to Life Committee Fund for Independent Political Expenditures ("NCRL-FIPE") (collectively "NCRL") respond to the motion to quash lodged by respondents Pew Charitable Trusts ("Pew"). Plaintiffs reserve the right to move to compel production of the documents sought under the subpoenas via separate motion and memorandum of support thereof. Fed. R. Civ. P. 45(c)(2)(B).

## Background

In March, 2005, the New York Post reported that Sean Treglia, a former program officer for the Pew Charitable Trusts ("Pew"), had fairly boasted the year before that Pew and several foundations spent nearly $140 million over the course of a decade as part of an express plan to"reform" campaign finance. *See* Ryan Sager, *Buying Reform*, The New York Post, Mar. 17, 2005 at 33. At a panel discussion at the University of Southern California's Annenburg School

**Response to Motion to Quash**

for Communications in March, 2004, Treglia revealed that Pew set out in the mid-1990's to

effect campaign finance reform according to a well funded, organized plan. Pew openly sought to

affect government policy and took a new, more aggressive tack, a practice he called "directive

funding." Treglia Trans. at 13, Pls'. Resp. Amici's Mot. to Quash, EXHIBIT C. "Instead of

sitting back and waiting for the good ideas to come in, Pew decided that it would hire

professionals and experts from the field . . . and ask them to go out and find people to advance

the goals of Pew." *Id*. As Treglia pointed out, "it's one thing to come up with an idea and write

and write about it in a paper. It's another thing to actually go out and drive the public policy

debate by strategically placing your money." *Id.*

The three prongs of the plan included: 1) Replacing previous frontal attacks with an

incremental approach[1] that shifts the goals to "a ban on soft money, new issue advocacy rules,

better disclosure, and a stand-by-your-ad provision." *Id*. at 17; 2) enrolling "experts" who will

support the reform agenda, and 3) creating the impression of a widespread popular movement for

campaign finance reform regardless of the actual scope of popular support. *Id.* at 17-18.

Both Democracy 21 and the Campaign Legal Center have received substantial funding

from the Pew Charitable Trusts for campaign finance reform activities. *See* PoliticalMoneyLine

Reports, Pls'. Resp. Amici's Mot. to Quash, EXHIBITS A, B. Thus, there is good reason to

explore the possibility that Democracy 21, the Campaign Legal Center, and Dr. Mann are not

unbiased, credible witnesses or experts in this case because any objective expertise may have

---

[1]Treglia revealed that the success of the federal plan was but a beginning. He referred to a "new strategy" formalized around 2002 when "[he] knew that [the BCRA] reform was going to come . . . . but it's unfolding now,  and the things that you're seeing in Washington around campaign finance reform aren't by mistake." Treglia Trans. at 21.

**Response to Motion to Quash**                    2

been compromised by funding agreements. Moreover, any participation in Pew's plans to create the "impression" of widespread calls for reform is relevant to a key defense in this case.

The Eastern District of North Carolina found the question of bias raised by the revelations about Pew and others to be relevant to the issues presented in the underlying litigation and amended its scheduling order accordingly. *See North Carolina Right to Life, Inc. v. Leake*, No. 5:99-CV-798-BO(3) Order at 2-3 (E.D. N.C. July 15, 2005) ("*NCRL*") ("The need to investigate the potential biases of those who will offer their expert opinions, both as amici and testifying witnesses, in a case of such public importance constitutes a sufficient showing of good cause [to allow additional discovery]").

**Argument**

**I. Pew Has Not Met Its Burden of Justifying Quashing the Subpoenas.**

Pew here moved to quash because, they claim, the requests present an "undue burden" and are "overly broad," Pew  Mem. at 8, because they are "irrelevant to any claim or defense in [the underlying litigation]," *id.*, and because the subpoenas would require disclosure of "privileged or other protected matter." *Id.* at  9.

The burden of establishing that a subpoena duces tecum should be quashed lies with the respondent. *Linder v. Department of Defense*, 133 F.3d 17, 24 (D.C. Cir. 1984); *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 n.28 (5th Cir. 2004). That burden is heavy. *Irons v. Karceski*, 74 F.3d 1262, 1264 (D.C. Cir.1995) (citing *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 403 (D.C. Cir. 1984). Pew also moves to quash the subpoena issued by NCRL in its entirety,  Resps.' Mem. at 22, despite the rule that "[m]odification of a subpoena is generally preferred to outright quashing." *Linder v. National Sec. Agency*, 94 F.3d 693, 698 (D.C.

**Response to Motion to Quash**                    3

Cir. 1996). *See also Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 407 (D.C. Cir. 1984) (expressing similar points).

Under Fed. R. Civ. P. 45(c)(3)(A)(i)-(iv), a court may quash or modify a subpoena if it (1) fails to allow a reasonable time for compliance; (2) requires a person who is not a party to travel more than 100 miles from where the person resides; (3) requires disclosure of privileged or protected matter; or (4) subjects a person to undue burden. *See Wiwa*, 392 F.3d at 817-18; *see also Linder v. National Security Agency*, 94 F.3d 693, 695 (D.C. Cir. 1996) (A district court is authorized to quash or modify a subpoena if it "subjects a person to undue burden."). Pew moves to quash for the third and fourth reasons. *See* Pew Mem. at 8 (requests are burdensome), 9 (they ask for protected information).

**A. Undue Burden**

Whether the subpoena presents an undue burden is determined according to the facts of the case. *Linder*, 133 F.3d at 24. The following factors are considered in determining whether a subpoena presents an undue burden: (1) relevance of the information requested; (2) the need of the party for the documents; (3) the breadth of the document request; (4) the time period covered by the request; (5) the particularity with which the party describes the requested documents; and (6) the burden imposed. *Wiwa*, 392 F.3d at 818, n.31 (citing *Williams v. City of Dallas*, 178 F.R.D. 103, 109 (N.D. Tex. 1998) (in turn quoting *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 49 (S.D.N.Y. 1996)). A court may find that a subpoena presents an undue burden when the subpoena is facially overbroad, *Wiwa*, 392 F.3d at 818, that is, if it is "limited neither by reasonable restrictions on time nor by particular documentary descriptions." *Williams*, 178 F.R.D. at 110. *See also British Int'l Insurance Co., Ltd. v. Seguros La Republica, S.A.*, 200

**Response to Motion to Quash**                    4

F.R.D. 586, 591 (W.D. Tex. 2000) (finding a subpoena not facially overbroad where the documents sought were relevant, their scope was limited by time and subject, documents were adequately described and the subpoena was subsequently limited by the party requesting the documents who also offered to pay costs.).

### 1. Relevance of the Information Requested

#### a. The Documents Sought Are Relevant Because They Will Tend to Prove or Disprove Biases and Credibility of the Witnesses and the Evidence They Rely On.

Evidence of the bias of a witness is always relevant. *United States v. Anderson*, 881 F.2d 1128 (D.C. Cir. 1989); *United States v. Turner*, 198 F.3d 425 (4th Cir. 1999). *See also* Fed. R. Civ. P. 26(b)(1) advisory committee's note (2000) (information that could be used to impeach a likely witness, even if not otherwise relevant to the claims or defenses, is properly discoverable).

The amici in the underlying litigation appear to be biased because they or the groups producing the research data on which they rely may have been funded by Pew with the agreement, tacit or overt, that certain results were to be reached or opinions expressed regardless of what the evidence said. As part of the six year plan drafted by Treglia for Pew, he directed money to establish a bank of "experts" to cite as support in Congressional hearings and, ultimately, in the litigation that followed passage of the Bipartisan Campaign Reform Act. Treglia Trans. at 18. Pew funded the debate leading to the passage and the litigation and subsequent upholding of much of the provisions of the BCRA. And indeed, the majority in *McConnell v. FEC* relied on the "substantial empirical record" Pew's plan proposed and funded. Thomas E. Mann, *Juice Worth the Squeeze*, 7 Pew Trust No. 2 Summer 2004 at 2-7. "[I]f you look at the Supreme Court decision," boasted Treglia, "you will see that almost half of the

**Response to Motion to Quash**                5

footnotes relied on by the Supreme Court in upholding the law are research funded by the Pew Charitable Trust." Treglia Trans. at 21.[2]

Yet there was ample evidence in the record there to conclude that the research and views expressed based on it were unreliable. *See McConnell v. FEC*, 251 F.Supp.2d 176, 307-09 (D. D.C.) (alternative findings of fact, Henderson, J. concurring in part and dissenting in part) (finding that the Pew-funded research done there was unreliable because the researchers "sought to achieve a certain result and therefore sacrificed scientific objectivity," the Pew funds "were solicited on the basis of the explicit promise that the study would be abandoned midstream if the results being obtained were not helpful to the cause for more stringent campaign finance regulation," and "on the promise that the study would be "design[ed] and execute[d]" to achieve "reform" and the study was so designed and executed.").

Plaintiffs in this case seek documents that would show that the amici's opinions offered are unreliable because they are themselves funded or based on research funded with similar explicit or implicit promises or requirements. The Treglia transcript and information on funding and sub-funding arrangements noted above give ample reason to suspect that documents exist showing that the amici's opinions are inherently unreliable because they or researchers providing data on which they rely sacrificed objectivity in exchange for financial support or because of

---

[2]For example, the *McConnell* decision to allow regulation of "electioneering communications" rested on the finding that they were the "functional equivalent" of express advocacy. *McConnell v. FEC*, 540 U.S. 93, 206 (2003). That finding was based in large part on evidence of their effect on would-be hearers, provided by reform lobby expert witnesses funded by Pew. *Id*. at 193. *See also* Thomas E. Mann, *Juice Worth the Squeeze* at 2-7 (noting this and the "pivotal role" of foundations in "nurturing the efforts that made possible the new . . . law;" and revealing the Pew Trusts' goals: "to improve disclosure, strengthen enforcement, ban or curtail soft money and regulate issue ads intended to influence elections.").

**Response to Motion to Quash**             6

their preexisting ideological support for increased regulation of political association and speech.

Plaintiffs are seeking documents from Pew as well as amici because it is likely that Pew might

possess relevant documents not in the possession of amici and vice versa. Moreover, Plaintiffs

are not certain exactly which entities possess which documents, and thus it is necessary to

subpoena Pew in addition to amici. The Pew subpoena was narrowed to include only the groups

and documents directly involved in the underlying litigation.

### b. The Information Sought is Relevant to a Claim, Defense, or the Subject Matter of the Underlying Case.

NCRL's document requests seek documents that are also relevant to a claim or defense in

the underlying case or relevant to the subject matter of the case.[3] The standard for relevance in

determining whether a subpoena imposes undue burden within the meaning of

Rule 45(c)(3)(A)(iv) is that of Rule 26(b)(1). *Linder*, 133 F.3d at 24. The federal rules demand no

more relevance for documents sought of nonparties than for documents or other discovery sought

of parties. 9A Wright and Miller, *Federal Practice and Procedure*, § 2459. The information

sought is relevant under this standard.

---

[3]Under Rule 26(b)(1), there are two categories of discovery: party-controlled and court-ordered:

> Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . . For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1). The advisory committee's notes expressly explain that in addition to "party-controlled discovery in terms of matter relevant to the claim or defense of any party" the court has authority "to order discovery of any matter relevant to the subject matter involved in the action for good cause." and "[t]he good-cause standard warranting broader discovery is meant to be flexible." Fed. R. Civ. P. 26(b)(1) advisory committee's note (2000). The discovery sought here is allowable under either category.

**Response to Motion to Quash** 7

Evidence of amici's arrangements with Pew and other funding sources is relevant to a defense in this action. North Carolina (and amici) defend the limit on contributions to independent expenditure committees by arguing that it is adequately supported by an interest in averting actual or apparent corruption. *See McConnell v. FEC*, 540 U.S. 93, 185 n.72 (2003) (If government seeks to constitutionally limit the rights of political speech and association inherent in contributions, it "must show concrete evidence that a particular type of financial transaction is corrupting or gives rise to the appearance of corruption and that the chosen means of regulation are closely drawn to address that real or apparent corruption."). In their brief, amici suggest, citing evidence offered by Dr. Mann, that unchecked contributions for "supposedly" independent expenditures pose "the same kind of corruption that was at the heart of the Supreme Court's analysis in *McConnell*." Mem. of Amici at 17. By suggesting activities are "improper" or "potentially corrupting," amici suggest actual corruption and create the appearance of corruption supporting the regulation they advocate. Amici effectively offer "evidence" of a condition that gives rise to a substantial interest that would support regulation.

The information sought by the subpoenas, evidence of tacit or overt agreement between amici, experts, and funding sources such as Pew is relevant to NCRL's claim and the state's countervailing defense that the limit on contributions to NCRL-FIPE is closely drawn to a substantial government interest because the existence of agreements would discredit their evidence and testimony of actual or apparent corruption. And even if the information sought is not limited to amici's offer of evidence in this particular matter, it is still relevant to claims and defenses raised, and hence discoverable, because it pertains to other incidents of the same type. Fed. R. Civ. P. 26(b)(1) advisory committee's note (2000). In other words, it is relevant to this

litigation to determine whether or not amici agreed here, in the BCRA affair or elsewhere, to compromise their objectivity.

Similarly, the information NCRL seeks would show that amici or the evidence they rely upon for their opinions exaggerate the extent of the public call for reform, falsely portraying a situation in a way that gives rise to a substantial government interest and hence, a defense of the challenged regulations. Treglia's plan called to "create an impression that a mass movement was afoot; that everywhere they looked, in the academic institutions, in the business community, in religious groups, in ethnic groups, everywhere people were talking about reform." Treglia Trans. at 18. Pew apparently created the impression to hide their own involvement in garnering support for the BCRA because it thought that Congress would discount the information and views had it known that Pew was the source. *Id.* at 27.[4] This supports the view that the research and rhetoric sponsored by Pew is suspect because of inherent bias. But inflating support for reform also inflates a government interest supporting regulating campaign finance.

Ginning up the specter of actual or apparent corruption and creating the impression that "everyone" is separately and collectively calling for reform manufactures evidence of public distrust of campaign finance in general and any of its particular practices. And the Supreme Court has recognized that this "erosion of confidence in the system of representative government" gives rise to a substantial government interest. *Nixon v. Shrink MO Gov't PAC*, 528 U.S. 377, 388-90 (2000). So "convey[ing] the impression that [an outcry for reform] was something coming naturally," Treglia Trans. at 28, also creates the illusion of eroding public

---

[4]"This strategy, I advised Pew that Pew should be in the background.  And by law the grantees always have to disclose. But I always encouraged the grantees never to mention Pew . . ." Treglia Trans. at 15.

confidence and falsely strengthens a commensurate substantial government interest in regulating the practice.

The documents sought are relevant to establishing bias, and as the District of North Carolina has aptly observed, the need to investigate the potential biases of amici and testifying witnesses in a case of such public importance weighs heavily in favor of allowing that discovery to unfold. *See Linder*, 133 F.3d at 24 (quoting *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 407 (D.C. Cir. 1984) ("Whether a burdensome subpoena is reasonable 'must be determined according to the facts of the case,' such as the party's need for the documents and the nature and importance of the litigation.").

### 2. The Need of the Party for the Documents

NCRL needs the documents sought because they may contain evidence that discredits testimony offered here and elsewhere and that evidence, by its nature, will be found in internal, unpublicized forms. Plaintiffs are seeking documents from Pew as well as amici because it is likely that Pew might possess relevant documents not in the possession of amici and vice versa.

NCRL believes that the documents sought – records of funding and sub-funding arrangements and of inter-organizational communications – candidly record evidence that the expert and amici's testimony here and elsewhere is based on funding agreements rather than objective analysis and is drafted and publicized to coincide with plans to create the impression of wide support rather than with actual events. It is insufficient to review public and published views as Pew, amici and the other organizations would not willingly reveal such arrangements. *See* Treglia Trans. at 15 (grantees were specifically instructed to minimize as much as possible the connection to Pew and its plans.). Without discovery, amici and Dr. Mann are allowed to

**Response to Motion to Quash**　　　　　10

offer evidence on which the case may ultimately be decided without allowing NCRL any "fuel"

for "cross examination." *See United States v. International Business Machines Corp.*, 83 F.R.D.

97, 106 (D.N.Y., 1979) ("*IBM*").

### 3. Breadth of Request

"The overbreadth element is but a restatement of the proposition that the relevance of and

need for documents sought will bear on the reasonableness of the subpoena." *Id.* A subpoena is

overbroad only "[t]o the extent a subpoena sweepingly pursues material with little apparent or

likely relevance to the subject matter." *Id.* at 106-07.  Here, NCRL has amply demonstrated the

relevance of the material to the claims, defenses and subject matter of this case. Documents

pertaining to other groups are requested, among other reasons, because "pass through" and sub-

funding between groups can camouflage the connection to the Pew plan and the resulting bias

and distortions. The time period covered by the subpoena corresponds to that of the Pew plan.

"To be sure, the subpoena is broad but not unreasonably so in light of its purpose." *Id.* at 107.

Moreover, on August 30, 2005, counsel for NCRL met and conferred with counsel for

Pew Charitable Trusts. Counsel for Pew voiced their objections to the requests as irrelevant.

NCRL asked if any documents requested were directly relevant from their perspective, and Pew

responded in the negative. Pew therefore undercut any claim of overbreadth, as they maintain

that none of the requests could produce relevant information.

### 4. Time Period

A demand for documents should cover a reasonable time period to insure that the
materials desired are sufficiently identified and to confine the search to relevant
documents. However, when relevance and need have been demonstrated, "(t)he
fact that the materials requested cover an extended period of time and are
voluminous will not render the subpoenas invalid . . . ."

**Response to Motion to Quash**          11

*Id.* at 107 (quoting *Democratic National Committee v. McCord*, 356 F.Supp. 1394, 1396

(D.D.C.1973)). As noted above, the time period covered by the subpoenas corresponds with the

time period covered by Pew's plan. It is reasonable to surmise that documents generated during

the time of the plan's express implementation, documents surrounding funding arrangements and

plans for activities will provide evidence that the groups offering testimony here had

compromised objectivity and were committed to a position despite any contrary data. The time

period of the documents in fact narrows the request by identifying them and adds to their

relevance because it corresponds with the time period relevant to other evidence that suggest

amici and Dr. Mann have compromised objectivity in their testimony here.[5]

### 5. Reasonable Particularity

" [A] subpoena must specify the documents sought with reasonable particularity, because

vague or duplicative demands may cause confusion and disarray in responding to the subpoena."

*IBM*, 83 F.R.D. at 107. "Particularization must be adequate, but not excessive, for the purposes

of the relevant inquiry." *Id.* (internal quotations and citation omitted). The documents sought

here are particularized by their purpose, their subject matter and the audience or speaker. NCRL

has framed them broadly but within narrow categories and often, with reference to specific

projects that research has shown might be purposed to influence public debate and litigation of

campaign finance regulations with only the appearance of objectivity. They relate to groups with

ties to Pew and/or the campaign finance reform community, other funding sources tied to the

purposes of Pew as revealed by Mr. Treglia, and projects specifically mentioned as being funded

---

[5]The requests covering the period outside this litigation pertain to incidents of the same type and are relevant to claims and defenses raised here. Fed. R. Civ. P. 26(b)(1) advisory committee's note (2000).

**Response to Motion to Quash**              12

by Pew. They are not further particularized because the individual identity of the responsive documents is not known until disclosure is made. *Id.*

NCRL has instead limited its requests to documents that research has shown are likely to expose any overt or implied agreements tying funding to research results, experts' opinions on the subject matter of this litigation, or efforts to increase the volume and breadth of calls for more regulation. By their very nature, these documents will adversely affect the efforts of amici, Dr. Mann, Pew, and the campaign finance reform movement in general. Broadly framed requests are therefore needed to avoid the evasion more particularized requests would allow.

Given that large numbers of documents are possibly involved, and that NCRL cannot achieve more particularity where it would allow Pew to avoid potentially harmful but relevant revelations, "common sense dictates that requests framed in terms of categories or types of documents are sufficient." *Id.*

### 6. Burden of Compliance

"[T]he burden of compliance must be compared with the size of and resources available to the responding party." *Id.* at 108. The campaign finance reform community has been reported as spending almost $140 million from 1994-2004, with over $40 million spent by Pew alone. PoliticalMoneyLine *Money in Politics Database: Campaign Finance Reform Lobby*. In 2003 alone, Pew granted $2,200,000 to Campaign Legal Center to "act as people's voice in administrative hearings and proceedings on campaign finance and media laws." PoliticalMoneyLine *Money in Politics Database: Democracy 21 Education Fund*, Pls'. Resp. Amici's Mot. to Quash, EXHIBIT A. In 2004, Pew granted $500,000 to Democracy 21 "to ensure the implementation and enforcement of the Bipartisan Campaign Finance Reform Act of

2002, and to build public support for an improved federal campaign finance enforcement system." *Id*. Moreover, Pew "will invest $204 million in fiscal year 2006 to provide organizations and citizens with fact-based research and practical solutions for challenging issues." Pew Charitable Trusts: *About Us* (*available at* http://www.pewtrusts.com/about/index.cfm).

Thus, Pew's estimate of the time to be spent responding to the subpoenas must be viewed in context of a well-funded organization, ostensibly with sophisticated communication networks and infrastructure. Moreover, NCRL offered to pay reasonable copying costs and to consider responses from Pew that were less than what the subpoenas encompassed on their face. Pew rejected the offer and hence the actual burden imposed by the subpoenas was not presented by Pew in their motion to quash.

Moreover, as here, there is a case of public importance, a substantial burden of compliance may be justified. *IBM*, 83 F.R.D. at 108. The district court in North Carolina recognized and considered the importance of the issues presented in the underlying litigation. Litigation addressing recognized burdens on First Amendment rights is, by definition, of public importance. Evidence that the proponents of additional regulation of the speech and association inherent in campaigns are "buying" data and the impression of widespread support will fundamentally change the public debate and the course of this and other litigation. The cost and burdens alleged here should "give way to the search for truth in this case of undoubted importance to the public weal." *Id.*

## II. First Amendment Privilege.

### A. The Claim of Privilege Is Inadequately Supported According to the Rules.

**Response to Motion to Quash**              14

Information withheld on a claim of privilege must be made expressly and must be supported by a description of the nature of the documents not produced that is sufficient to enable the demanding party to contest the claim. Fed. R. Civ. P. 45(d)(2). Failure to sufficiently support a claim of privilege "is deemed to waive the underlying privilege claim." *GFL Advantage Fund, Ltd. v. Colkitt*, 216 F.R.D. 189, 195 (D.D.C. 2003) (internal quotations and citation omitted).

Pew here asserts a First Amendment privilege against disclosure of documents sought. Pew Mem. at 9-15. Yet the description they provide of the documents withheld on the basis of this claim is lacking. Pew asserts the conclusion of privilege, *id.* at 9 ("The subpoena's demands go, not to the heart of the lawsuit, but to the heart of First Amendment interests"), a general claim that the document requests would chill speech by causing Pew and its grantees "to curtail or withdraw from engaging in the rights of public speech and association that are central to their public service activities," *id.* at 12, and a sweeping claim that NCRL demands production of documents "indicative of how [Pew] organizes, conducts, and decides to promote its recognized charitable purposes." *Id.* at 17.

These critiques of the requests do not meet the requirements of the rule because they imply that every document responsive to the subpoenas is privileged. The purpose of the required list describing supposedly privileged documents is to describe them sufficiently so as to give the seeker sufficient opportunity to contest the claim of privilege. Fed. R. Civ. P. 45(d)(2). While some documents reasonably deemed to be covered by the requests may arguably come under a First Amendment privilege, a list of those so claimed as so by Pew is required precisely so that such a determination can be made. This case illustrates the need of a descriptive list when

**Response to Motion to Quash**                    15

claiming a privilege because it is not apparent how *all* the documents requested fall under the privilege invoked.

**B. The Documents Requested Do Not Give Rise to a First Amendment Privilege.**

Before applying the balancing test announced in *International Union v. National Right to Work Legal Defense and Ed. Fund, Inc.*, 590 F.2d 1139, 1152 (D.C. Cir. 1978) for deciding whether the generally universal disclosure required in discovery is outweighed by First Amendment infringement, Pew must establish that the privilege should apply by asserting a *substantial* claim of constitutional privilege. *Id.* The heavy burden of establishing an evidentiary privilege lies with the litigant claiming it: "Evidentiary privileges are not favored, and even those rooted in the Constitution must give way in proper circumstances . . . '[w]hatever their origins, . . . exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth.'" *Herbert v. Lando*, 441 U.S. 153, 175 (1979) (quoting *United States v. Nixon*, 418 U.S. 683, 710 (1974)) (addressing reporters' First Amendment privilege). Pew has not and cannot carry that burden as the constitutional interest they claim in keeping the requested information from NCRL is attenuated in at least two ways.

**1. The Information Sought Here is Not Generally Covered by a First Amendment Privilege**

First, the information sought by the subpoenas here is not generally found to be constitutionally privileged, as it does not present a substantial burden on First Amendment rights. *AFL-CIO v. FEC*, 333 F.3d 168, 176 (D.C. Cir. 2003). Membership lists, donors' lists and affiliation lists are protected because members, donors, and affiliates of politically-related

**Response to Motion to Quash**          16

organizations can suffer reprisals and harassment if they are identified as associated with groups holding unpopular positions and, as a consequence, are deterred from that association. *NAACP*, 357 U.S. 449, 462-63 (1958). Members, donors and affiliates may therefore remain anonymous with regard to these activities because "compelled disclosure of political affiliations and activities can impose just as substantial a burden on First Amendment rights as can direct regulation." *AFL-CIO v. FEC*, 333 F.3d at 175.

NCRL does not seek membership and volunteer lists, contributor lists, or documentation of the past political activities of Pew or those with whom they have been affiliated. *Cf. International Action Ctr v. United States*, 207 F.R.D. 1, 9 (D.D.C. 2002) (and cases cited therein) (holding these specific activities to be undiscoverable under the First Amendment). *See also Black Panther Party v. Smith*, 661 F.2d 1243, 1265-69 (D.C. Cir. 1981) (*vacated as moot*, *Smith v. Black Panther Party*, 458 U.S. 1118 (1982)) (and authorities cited therein) (holding a balancing test was required because, as relevant case law attested, a First Amendment privilege attached to the information sought there, membership lists of groups engaged in political expression); *Wilkinson v. Federal Bureau of Investigation*, 111 F.R.D. 432, 436 (C.D. CA 1986) (holding that although a First Amendment privilege exists for discovery disputes, the heightened scrutiny described in *International Union* applies only when the discovery seeks the group's membership list or list of financial contributors).

Pew attempts to expand the boundaries of this category by claiming a First Amendment privilege applies to each and every document request merely because each might cause Pew and its grantees "to curtail or withdraw from engaging in the rights of public speech and association that are central to their public service activities." Pew Mem. at 12. Furthermore, they exaggerate

**Response to Motion to Quash**          17

the scope of the document requests, citing general descriptions in NCRL's briefs in support of amending the trial court's scheduling order rather than the subpoenas themselves to assert that such information is even sought. At bottom, Pew fails to show how the discovery requested here will deter even the rights they claim. While membership and donor lists give rise to fears of reprisal that deter association, Amici do not show how the documents requested here would deter association or cause pew and its grantees "to curtail or withdraw from engaging in the rights of public speech and association that are central to their public service activities." Pew Mem. at 12.

A valid interest in resisting disclosure in this context depends on whether the disclosure will result in retribution or attack that will deter future association, *AFL-CIO v. FEC*, 333 F.3d 168, 176 (D.C. Cir. 2003),[6] or exposing detailed strategies to opponents that "potential[ly] damage . . . political groups' effectiveness." *Id.* at 177. But NCRL does not seek "internal planning materials," that might, if exposed, "frustrate those groups' decisions."*Id.* at 177. And even if producing the documents requested here threatens in this way, that is, assuming, arguendo, that retribution, harassment or attack are a legitimate threat when private litigants gain access to information via a subpoena in private litigation, there is no valid anonymity or secrecy interest.

_____

[6]The constitutional burden imposed by forced disclosure of membership lists expressed in *NAACP v. Alabama*, 357 U.S. 449 (1958) and noted above is inapplicable when the information is not publicized. *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1015 n.2 (D.C. Cir. 1991) (noting that *NAACP* involved "the First Amendment guarantee of *privacy* of association and belief") (emphasis added). Where no threat to this privacy occurs, "the line of associational cases is simply inapposite." *Id.* Hence, where the material is not made public, possible constitutional injury is limited to government interference with a group's "associational autonomy." *AFL-CIO v. FEC*, 333 F.3d 168, 177 (citing *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214 (1989)). No such threat exists here because NCRL has no authority to limit any aspect of amici's organization, leadership, or internal affairs.

**Response to Motion to Quash**                18

First, it is not clear that anonymity is compromised in a way that gives rise to the specter of reprisal and harassment simply because a private litigant gains access to materials. "[P]retrial depositions and interrogatories are not public components of a civil trial." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33. The court in *AFL-CIO* carefully distinguished between disclosure to the entity seeking the information for its own purposes, (there, a government agency had gathered the information as part of an investigation), and disclosure to the public, "'a separate first amendment issue.'" 333 F.3d at 176 (quoting *Block v. Meese*, 793 F.2d 1303, 1315 (D.C. Cir. 1986)).[7] There is no legitimate threat of reprisal or damage to Pew's effectiveness stemming from

_____

[7]It is also unclear whether disclosure to private litigants carries the same threat of chilling as would releasing the same information to the government. *See*, *e.g.*, *International Action Ctr v. United States*, 207 F.R.D. 1, 3-4 (D.D.C. 2002) (holding that a protective order limiting the use of the information sought to government lawyers would be inadequate because "[i]t is the government itself that Plaintiffs fear, and therefore confining that information to government . . . counsel will hardly assuage those fears or avoid the intimidation that Plaintiffs fear might follow."); *FEC v. Machinists Non-Partisan Political League*, 655 F.2d 380, 388, ("release of such information to the government carries with it a real potential for chilling the free exercise of political speech and association guarded by the first amendment."), 389 ("Current first amendment jurisprudence makes clear that before a state or federal body can compel disclosure of information which would trespass upon first amendment freedoms, a 'subordinating interest of the State' must be proffered, and it must be 'compelling'") (quoting *NAACP v. Alabama*, 357 U.S. 449) (in turn quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 265 (1957)); *Block v. Meese*, 793 F.2d 1303, 1315 (D.C. Cir. 1986) (regulation requiring a foreign agent to report identifying and attendance information of entities using a political propaganda film is "government action that implicates the first amendment" and such "'compelled disclosure, in itself, can seriously infringe on privacy of association and belief'" (quoting *Buckley v. Valeo*, 424 U.S. 1, 64 (1976))).

*But see In re the Bible Speaks*, 69 B.R. 643, 647 (D. Mass. 1987) ("A few courts have held that other freedoms under the First Amendment can create a privilege in discovery even in the context of a private suit without government involvement") (citing *Black Panther Party*, 661 F.2d at 1264-70; *Adolf Coors Co. v. Wallace*, 570 F. Supp. 202, 208-10 (N.D. Cal. 1983) (private discovery of gay rights group's members); *Grinnell Corp. v. Hackett*, 22 Fed. R. Serv.2d (Callaghan) 482 (D.R.I. 1976) (private discovery of membership lists of an employer's association); *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 596-98 (1st Cir. 1980) (private discovery of reporter's source of information)).

disclosure alleged here, nor could there be.

To the extent that exposing the information sought merely threatens Pew "to curtail or withdraw from engaging in the rights of public speech and association that are central to their public service activities," Pew Mem. at 12., that threat is attenuated because the information responsive to the subpoenas that involves organizing, funding and association with other groups for specific projects is largely available in the public domain. Indeed, the connections between Pew, other funders, amici and other groups were traced by counsel for NCRL through arduous but commonly employed research techniques.[8] Preserving privacy as to the activities for which Pew claims a First Amendment privilege is precluded.

Where, as here, keeping identifying information private is not at stake, "the line of associational cases [stemming from *NAACP*] is simply inapposite." *Penthouse*, 939 F.2d at 1015 n.2. In other words, a party cannot claim a privacy right where the information sought to be protected is already publicly available, and, more importantly, where no privacy interest supports a claim of an *NAACP* infringement on rights of association and belief, a claim of privilege is improper. *Id.* (citing *Uphaus v. Wyman*, 360 U.S. 72, 81 (1959) (where list is already publicly available, First Amendment privacy interest is slight)); *see also Adolf Coors Co. v. Movement Against Racism and the Klan*, 777 F.2d 1538, 1542 (11th Cir. 1985) (finding infringement on right of association by discovery ordered was lacking because the threat of reprisal from disclosure of two-year old events was too improbable and the information sought was in the public domain).

---

[8]Of course, the responsive documents that detail whether or not amici agreed to or did in fact compromise objectivity for funding and/or to exaggerate their claims of public support for additional regulation of campaign finance remain, if they exist, outside the public eye.

**Response to Motion to Quash**              20

Moreover, even if there is a First Amendment interest attached to the information Pew claims NCRL seeks, it is difficult to see how disclosure of the information would *deter* them from engaging in the rights of public speech and association. It is their self-described purpose to publicize and clamor for reform and evidence of them doing so would seem instead to further that exercise. Exposing Pew's interactions with other groups does not threaten the interests claimed by Pew. They are a major funding source for organizations, trusts and individuals who openly support the positions taken by amici and thus would not be deterred from association if their participation is revealed.[9] Second, practically speaking, the information sought does not plausibly give rise to the fears Pew claims motivate their refusal to produce the documents. Much of the information is quite dated from a publicity and tactical perspective. The effects on public debate and the political process are already accomplished. *See Adolf Coors Co. v. Movement Against Racism and the Klan*, 777 F.2d 1538, 1542 (11th Cir. 1985) (dated information does not give rise to threat to association from fear of reprisal).

### C. The Requests Meet this Circuit's Test for Weighing First Amendment Concerns in Discovery.

The standard announced in *Int'l Union v. Nat'l Right to Work Legal Defense Fund and*

_____

[9]Indeed, according to Sean Treglia, the Pew program officer in charge of funding campaign finance reform, it was Pew's own plan that was implemented and his duty to find willing vehicles to carry it out:

> Instead of sitting back and waiting for the good ideas to come in, Pew decided that it would hire professionals and experts from the field and ask them to choose how the money would be spent, ask them to define the goals, ask them to draft the strategies, and ask them to go out and find people to advance the goals of Pew.

Treglia Trans. at 13; *id.* at 17 ("And so with this in mind I drafted a six-year strategy that had specific goals, and it had annual benchmarks, and those benchmarks were critical because that's how I got my raises.")

*Educ. Found.*, 590 F.2d 1139 (D.C Cir. 1978) is met here. First, the information sought goes to the heart of the lawsuit. Evidence of the bias of a witness is always relevant. *United States v. Anderson*, 881 F.2d 1128; *United States v. Turner*, 198 F.3d 425. *See also* Fed. R. Civ. P. 26(b)(1) advisory committee's note (2000). As Judge Boyle aptly noted when considering the relevance of the information sought here to the underlying litigation, "[t]he need to investigate the potential biases of those who will offer their expert opinions, both as amici and testifying witnesses, in a case of such public importance constitutes a sufficient showing of good cause [to allow additional discovery]"). *NCRL*, No. 5:99-CV-798-BO(3) Order at 2-3.

In cases arising under the First Amendment's protection of political speech and association, it is of paramount importance whether those supplying opinions and information are biased, especially when those opinions give rise to a substantial government interest in averting actual or apparent corruption or addressing eroding public confidence in our system of representative government.

### a. NCRL Sought the Information Through Alternative Means and Made Reasonable Attempts to Obtain the Information Elsewhere.

As noted in their briefing to the North Carolina district court, NCRL invested considerable time and effort to trace the various connections among funders and groups dedicated to campaign finance reform. Counsel sought and obtained a tape of Mr. Treglia's revelations and had it transcribed and searched publicly filed finance documents such as those attached as exhibits here, as well as dozens of articles, essays, transcripts and web sites. Not surprisingly, Pew's publicly accessible documents do not address the questions of importance here: Did the amici here compromise objectivity as part of their acceptance of funding, and did

**Response to Motion to Quash**          22

they agree, tacitly or overtly, to help create the impression that the public wanted reform?

## Conclusion

There is ample evidence that amici in the underlying litigation have compromised their objectivity as witnesses. The information sought by subpoena here is not available elsewhere, and could reveal whether Pew has made tacit or overt agreements with amici or other organizations to offer opinions in favor of North Carolina or other government seeking to expand regulation of campaign finance regulation. It is likely that Pew possesses relevant documents not in the possession of amici. Pew failed to justify the extraordinary remedy of quashing a subpoena that seeks relevant information to a suit of such public importance. When analyzed by the applicable standards, the requests do not present an undue burden to discovery and Pew's claims of privilege are inadequately supported under the rules and the documents requested do not give rise to a First Amendment privilege.

Accordingly, NCRL asks that this court deny Pew's Motion to Quash.

Respectfully submitted,

Dated **September 15, 2005**

BOPP, COLESON & BOSTROM

_____

Jeffrey P. Gallant
Bar No. 46876 (VA)
James Bopp, Jr.
Bar No. 2838-84 (IN)
1 South 6th Street
Terre Haute, IN 47807-3510
Ph: (812) 232-2434
Fx: (812) 235-3685

**Response to Motion to Quash**                23

*Lead Counsel for Plaintiffs*
*Pro Hac Vice Motion Filed Aug. 18, 2005*

_____

David W. New
D.C. Bar  # 428046
Attorney at Law
6701 Democracy Blvd.
Suite 300
Bethesda, MD 20817
301-468-4905
*Local Counsel for Plaintiffs*